UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNION ELECTRIC CO., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 4:14 CV 31 RWS |
| | ) |
| CHICAGO BRIDGE & IRON COMPANY, et al., | ) |
| | ) |
| Defendant. | ) |

# MEMORANDUM AND ORDER

Plaintiff Union Electric Company, doing business as Ameren Missouri ("Ameren"), seeks to recover against Defendant CB&I Stone & Webster Construction, Inc. ("S&WC")[1] for damages that occurred while S&WC was performing maintenance services at Ameren's Callaway Nuclear Power Plant ("Callaway"). S&WC moves for partial judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). Plaintiff opposes this motion and the issues are fully briefed. For the reasons set forth below, I will grant S&WC's motion for partial judgment on the pleadings.

## BACKGROUND

On August 31, 2009, Ameren and S&WC entered into a Nuclear Services Agreement (the "Agreement"). Under the Agreement, S&WC was to perform modification and maintenance services at the Callaway plant upon Ameren's request.

On April 2, 2013, S&WC's workers were assigned the job of placing Personal Protection Equipment grounds in preparation for Power Factor testing at Callaway. Compl., at ¶ 15.

---

[1] Ameren originally named Chicago Bridge & Iron Co. and Stone & Webster Construction, Inc. as defendants in this case. Chicago Bridge & Iron Co. has since been dismissed from the case, and on December 26, 2013, Stone & Webster Construction, Inc. changed its name to CB&I Stone & Webster Construction, Inc.

According to the complaint, while S&WC's workers were performing this work, an arc flash occurred, causing property damage to the transformer and injuries to the S&WC workers. Id. at ¶ 24(c).

On November 18, 2013, Ameren filed its original petition in St. Louis County Circuit Court. On December 19, 2013, Ameren filed an amended petition. On January 9, 2014, S&WC removed the case to this Court.

The complaint alleges claims for breach of contract (Count III) and negligence (Count IV) against S&WC for damages related to the arc flash incident. Both counts allege that S&WC breached the Agreement (Count III) or was negligent (Count IV) by (a) not performing a Live-Dead-Live test (a test to determine if a circuit is live) prior to placing a grounding device on a bus bar in a transformer; (b) not waiting for directions before proceeding with placing a grounding device on a bus bar in a transformer when S&WC was uncertain how to interpret the plans and drawings of the transformer; and (c) failing to provide Ameren a competent Site Manager, competent superintendents, and competent supervisors at Callaway.

Ameren seeks recovery for the following six categories of damages: (a) $174,000 in physical damages to the transformer that was allegedly damaged during the arc flash incident; (b) $782,000 for delaying the state of "Refuel 19" for two days; (c) $265,000 for S&WC employees that were sent offsite to be remediated and given a safety orientation after the arc flash incident; (d) $38,000 for safety stand downs conducted by Ameren for all employees at Callaway after the arc flash incident; (e) $40,000 for Ameren to train and badge new employees after the arc flash incident, and (f) $775,000 for payments made to S&WC for services of a competent and capable

site manager, superintendent and supervisors at Callaway that Ameren alleges it did not receive.[2] Id. at ¶¶ 53, 59.

S&WC now moves for partial judgment on the pleadings, arguing that all of Ameren's claimed damages, except the $174,000 category (a) claim for property damage, are explicitly barred by the Limitation of Liability clause in the Agreement. See id., Ex. A at § XXIX.B(ii), p. 28. Specifically, S&WC argues that the damages are barred because they are consequential or indirect damages based on breach of contract and property damage.

**Legal standard**

In ruling on a motion for judgment on the pleadings under Fed. R. Civ. P. 12(c), I must "accept as true all facts pleaded by the non-moving party and grant all reasonable inferences from the pleadings in favor of the non-moving party." United States v. Any & All Radio Station Transmission Equip., 207 F.3d 458, 462 (8th Cir. 2000) (citing Fed. R. Civ. P. 12(c)). This is a strict standard, as "[j]udgment on the pleadings is not properly granted unless the moving party has clearly established that no material issue of fact remains to be resolved and the party is entitled to a judgment as a matter of law." Id. "The motion for judgment on the pleadings only has utility when all material allegations of fact are admitted or not controverted in the pleadings and only questions of law remain to be decided by the district court." Wright & Miller, Federal Practice and Procedure: Civil 3d § 1367. As summarized in Federal Practice and Procedure:

> [A] Rule 12(c) motion is designed to provide a means of disposing of cases when the material facts are not in dispute between the parties and a judgment on the merits can be achieved by focusing on the content of the competing pleadings,

---

[2] It is unclear whether S&WC is seeking dismissal of the category (f) damages of $775,000 for recovery of payments made to S&WC for the services provided. In its memorandum of law in support of its motion for judgment on the pleadings, S&WC states that it seeks dismissal of all claims except for category (a) property damages. Yet Ameren states in its memorandum in opposition that S&WC is not seeking dismissal of category (f) damages. Furthermore, S&WC recently filed a Motion for Partial Summary Judgment on this same issue which does not include the category (f) damages. Because it is unclear whether S&WC intends to include the category (f) damages in this motion, I will exclude it from my consideration at this point and will address the question of whether Ameren continues to seek category (f) damages by separate order.

3

exhibits thereto, matters incorporated by reference in the pleadings, whatever is central or integral to the claim for relief or defense, and any facts of which the district court will take judicial notice.

Id., at *3 (quoting 5C Charles Alan Wright & Arthur Miller, Federal Practice and Procedure § 1367 (3d ed.2010)).

Generally, a court must ignore materials that are outside of the pleadings; however, the court may "consider some public records, materials that do not contradict the complaint, or materials that are 'necessarily embraced by the pleadings.'" Noble Sys. Corp. v. Alorica Cent., LLC, 543 F.3d 978, 982 (8th Cir. 2008) (quoting Porous Media Corp. v. Pall Corp., 186 F.3d 1077, 1079 (8th Cir. 1999)); see also 5B Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure: Civil 3d § 1357, at 376 (2004) (suggesting that a trial court may consider "matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint"). Here, the Agreement was attached to the Amended Petition and is therefore properly before the Court. Compl., Ex. A #[1-1].

Under Federal Rule of Civil Procedure 12(d), if matters outside of the pleadings are presented in a motion for judgment on the pleadings, a court may exclude them from consideration, or may consider them and convert the motion into one for summary judgment. In its Sur-Reply, Ameren discusses and attached additional materials that were outside of the pleadings. I decline to consider the outside materials and thus do not convert the motion into one for summary judgment.[3]

---

[3] Even if I were inclined to consider these outside materials, doing so would be improper because Ameren attempts to introduce the materials as extrinsic evidence illustrating the meaning of the contract. As will be discussed below, I have determined that the contract is unambiguous. As a result, my interpretation of the meaning of the contract is generally limited to the language of the contract itself. See Deal v. Consumer Programs, Inc., 470 F.3d 1225, 1230 (8th Cir. 2006) (internal citations omitted).

**Discussion**

The parties do not dispute the existence of the Agreement or any other material facts. Rather, the dispute is about whether the Limitation of Liability clause bars the relief that Ameren seeks.

The parties agree that Missouri law governs their Agreement. Under Missouri law, the interpretation of a contract is a question of law. Adbar Co., L.C. v. PCAA Missouri, LLC, 2008 WL 68858 at *4 (E.D.Mo. Jan. 4, 2008). "When a contract uses plain and unequivocal language, it must be enforced as written." Deal v. Consumer Programs, Inc., 470 F.3d 1225, 1230 (8th Cir. 2006) (internal citations omitted). An ambiguity does not exist merely because the parties dispute the meaning of the contract. Chehval v. St. John's Mercy Med. Ctr., 958 S.W.2d 36, 38 (Mo. Ct. App. 1997). If a contract is unambiguous, "the terms of a contract are read as a whole to determine the intention of the parties and are given their plain, ordinary, and usual meaning." Dunn Indus. Grp., Inc. v. City of Sugar Creek, 112 S.W.3d 421, 428 (Mo. 2003). "[E]ach term of a contract is construed to avoid rendering other terms meaningless. A construction that attributes a reasonable meaning to all the provisions of the agreement is preferred to one that leaves some of the provisions without function or sense." Id. (internal citations omitted). Where, as here, the parties are sophisticated business entities who rely on experts to advise them, the language they have mutually negotiated and agreed to is the best evidence of what they intended. Schnuck Mkts., Inc. v. First Data Merch. Data Servs. Corp., No. 4:13CV2226, 2015 WL 224993, at *6 (E.D. Mo. Jan. 15, 2015) (citing In re SRC Holding Corp., 545 F.3d 661, 668 (8th Cir.2008); enXco Dev. Corp. v. N. States Power Co., 758 F.3d 940, 947 (8th Cir.2014)).

Whether language is ambiguous is a question of law for the court. Phipps v. Sch. Dist. of Kansas City, 645 S.W.2d 91, 100 (Mo. Ct. App. 1982). To determine whether a contract is

5

ambiguous, courts consider the instrument as a whole, giving the words their ordinary meaning. Young Dental Mfg. Co. v. Eng'red Prods., Inc., 838 S.W.2d 154, 156 (Mo.Ct.App.1992) (internal citations omitted). An ambiguity exists when there is duplicity, indistinctness, or uncertainty in the meaning of the words used in the contract. Peters v. Emp'rs Mut. Cas. Co., 853 S.W.2d 300, 302 (Mo. 1993). "Language that is ambiguous to an unsophisticated party may not be ambiguous to a sophisticated commercial entity." Purcell Tire & Rubber Co. v. Executive Beechcraft, Inc., 59 S.W.3d 505, 510-11 (Mo. 2001).

   A. <u>Validity of the Limitation of Liability Clause</u>

As an initial matter, the parties agree that the Limitation of Liability clause in the Agreement is enforceable and not against public policy. I concur. It is well-settled in Missouri that "[s]ophisticated parties have freedom of contract—even to make a bad bargain, or to relinquish fundamental rights." Sports Capital Holdings, LLC v. Schindler Elevator Corp. & Kone, No. 4:12CV1108, 2014 WL 1400159, at *2 (E.D. Mo. Apr. 10, 2014) (citing Purcell Tire & Rubber Co. v. Exec. Beechcraft, Inc., 59 S.W.3d 505, 508 (Mo. banc 2001)). This freedom includes the right to contractually limit future remedies for consequential damages. Id.; see also Roy A. Elam Masonry, Inc. v. Fru–Con Constr. Corp., 922 S.W.2d 783, 791 (Mo.App.E.D.1996) ("Provisions in private contracts limiting or excluding liability for consequential damages have been held not violative of public policy, provided the limitation or exclusion was not unconscionable"). Limitations of liability do not violate public policy where the language is clear, unambiguous, unmistakable, and conspicuous. Purcell Tire, 59 S.W.3d at 509.

Here, two experienced and sophisticated entities with roughly equal bargaining positions agreed to a contract for nuclear maintenance services. Ameren does not allege any fraud or misrepresentation on the part of S&WC with regard to the Agreement or the Limitation of

6

Liability clause. The Limitation of Liability also is readily ascertainable, i.e., it is not buried in small print or otherwise inconspicuous. As a result, there is no unconscionability, procedural or substantive, barring the application of Section XXIX.B(ii) to the damages claimed by Ameren in this case. See Roy A. Elam v. Fru-Con Constr. Corp., 922 S.W.2d at 790.

B. The Limitation of Liability Clause

The Limitation of Liability clause, Section XXIX.B(ii) of the Agreement, provides:

B. Consequential Damages

(ii) With respect to claims for breach of contract and each other's property damage, neither Party and their parents, affiliates and subsidiaries shall be responsible to the other for consequential, incidental, indirect, punitive or exemplary losses or damages, or any liability for loss of revenue, loss of profit, loss of product, loss of replacement power or business interruption, loss of business opportunity, howsoever caused, including negligence, gross negligence, and strict liability.

Compl., Ex. A at § XXIX.B(ii), p. 28. Ameren argues that the limitation of liability only applies to claims for breach of contract and property damage, and does not waive liability for damages consequential to a negligence claim. In the alternative, Ameren argues that the clause is ambiguous because it is subject to two reasonable interpretations – either that it only applies to breach of contract and property claims, or that it also applies to bar claims of negligence.

To determine whether the Limitation of Liability clause is ambiguous, I must review the clause, as well as the contract, as a whole. See Dunn Indus. Grp., Inc. v. City of Sugar Creek, 112 S.W.3d 421, 428 (Mo. 2003) (internal citations omitted). Ameren argues that I need look no further than the first few words of the Limitation of Liability clause, which starts, "[w]ith respect to claims for breach of contract and each other's property damage . . ." to understand the meaning of the clause. Ameren argues that this language limits the application of the clause to claims for breach of contract and property damage and excludes claims brought under a

7

negligence theory. However, the sentence concludes with, "howsoever caused, including negligence, gross negligence, and strict liability." Compl., Ex. A at § XXIX.B(ii), p. 28. Whether placed at the beginning or the end of the sentence, it is clear that the parties expressly prohibited recovery for consequential damages caused by negligence. Any other interpretation would render the phrase, "howsoever caused, including negligence, gross negligence, and strict liability" meaningless. Such a result would go against the principles of contract interpretation. See Dunn Indus. Grp., Inc. v. City of Sugar Creek, 112 S.W.3d 421, 428 (Mo. 2003). Additionally, the parties here are sophisticated business entities. As such, the language they have mutually negotiated and agreed to is the best evidence of what they intended. Schnuck Markets, Inc. v. First Data Merch. Data Servs. Corp., No. 4:13CV2226, 2015 WL 224993, at *6 (E.D. Mo. Jan. 15, 2015) (citing In re SRC Holding Corp., 545 F.3d 661, 668 (8th Cir.2008)).

Applying the appropriate standards, I find that the Limitation of Liability clause is clear and unambiguous. The only reasonable interpretation of the Limitation of Liability clause is that it limits liability for damages consequential to breach of contract or property damage, even when those damages are caused by negligence.

Having determined that the Limitation of Liability clause is unambiguous and applies to negligence claims, I turn next to the question of whether the clause, as applied here, precludes the recovery that Ameren seeks in its claims for breach of contract (Count III) and negligence (Count IV).

C. Breach of Contract (Count III)

It is undisputed that the Limitation of Liability clause bars recovery for consequential damages based on claims for breach of contract or property damage. What is disputed is whether

8

the damages Ameren seeks in Count III are "consequential" or "incidental" damages based on breach of contract or property damage.

The Agreement does not define the term "consequential damages." The Limitation of Liability clause, however, provides some guidance on what is meant by consequential or indirect damages by listing several examples of damages that are barred: "any liability for loss of revenue, loss of profit, loss of product, loss of replacement power or business interruption, loss of business opportunity." Compl., Ex. A at § XXIX.B(ii), p. 28. These examples are consistent with Missouri law and other definitions of consequential damages. The Missouri Court of Appeals for the Eastern District has defined consequential damages as "those damages naturally and proximately caused by the commission of the breach and those damages that reasonably could have been contemplated by the defendant at the time of the parties' agreement." Ullrich v. CADCO, Inc., 244 S.W.3d 772, 779 (Mo. App. 2008) (citation omitted). Black's Law Dictionary defines consequential damages as "[l]osses that do not flow directly and immediately from an injurious act but that result indirectly from the act." Damages, Black's Law Dictionary 17c (10th ed. 2014).

Ameren seeks damages based on a two day delay to the start of the outage, offsite remediation, safety orientations, safety stand downs, as well as training and badging for new employees. These are not damages directly and immediately caused by the arc flash incident which damaged the transformer. Instead, these are damages that result indirectly from the arc flash incident. Moreover, these are exactly the kinds of consequential or indirect damages that parties to a nuclear services contract would contemplate at the time of the parties' agreement. Accordingly, these damages are "consequential, incidental, indirect, punitive or exemplary losses or damages" under the broad language of the Agreement and Missouri law. As a result,

Ameren's claim for breach of contract is barred to the extent that it seeks consequential damages for the following categories of damages: (b) $782,000 for delaying the state of "Refuel 19" for two days; (c) $265,000 for S&WC employees that were sent offsite to be remediated and given a safety orientation after the arc flash incident; (d) $38,000 for safety stand downs conducted by Ameren for all employees at Callaway after the arc flash incident; and (e) $40,000 for Ameren to train and badge new employees after the arc flash incident.

D. Negligence (Count IV)

Ameren alleges that S&WC was negligent in performing maintenance and causing the arc flash incident at Callaway on April 2, 2013. Specifically, Ameren claims that S&WC was negligent in the same ways Ameren claims S&WC breached the contract: by (a) not performing a Live-Dead-Live test (a test to determine if a circuit is live) prior to placing a grounding device on a bus bar in a transformer; (b) not waiting for directions before proceeding with placing a grounding device on a bus bar in a transformer when S&WC was uncertain how to interpret the plans and drawings of the transformer; and (c) failing to provide Ameren a competent Site Manager, competent superintendents, and competent supervisors at Callaway. Ameren seeks the same damages under its negligence claim as it does under its claim for breach of contract.

S&WC argues that Ameren's claim for negligence is not a viable claim under Missouri law because it is merely a restatement of its breach of contract claim and is not based on a breach of any duties independent of the duties provided for in the Agreement. It is true that S&WC agreed to follow certain safety protocols and procedures in the Agreement. However, while a mere breach of contract does not provide a basis for tort liability, the negligent act or omission which breaches the contract may serve as a basis for an action in tort. Liberty Mut. Fire Ins. Co. v. Centimark Corp., No. 4:08CV230, 2008 WL 5423440, at *2 (E.D. Mo. Dec. 29, 2008). "If the

duty arises solely from the contract, the action is contractual. The action may be in tort, however, if the party sues for breach of a duty recognized by the law as arising from the relationship or status the parties have created by their agreement." Id. (internal citations omitted). Here, Ameren has alleged that S&WC was obligated to "take all reasonable precautions in the performance of its work," was obligated to "perform its work in a good and workmanlike manner," and was obligated to "comply with the Callaway Safe Work Practices Manual and OSHA." Compl. ¶ 55-56. Thus, Ameren's negligence claim does not arise solely in contract and will not be dismissed on this basis.

However, Ameren's claims for damages under the negligence claim fail for another reason—they are barred by the Limitation of Liability clause. Ameren argues that its claims for damages for the stand down, re-training, and delay are not consequential of, nor incidental to, the property damage to the transformer. Rather, Ameren argues that these damages result from a "breach of safety protocol" and the "seriousness of the event." Because these damages would have occurred following the arc flash incident even if there had been no property damage or injuries, Ameren argues that the damages cannot be consequential to a breach of contract or property damage. I disagree. The Limitation of Liability clause broadly waives liability for "consequential, incidental, indirect, punitive or exemplary losses or damages" based on breach of contract or property damage, howsoever caused. There is no language limiting the waiver to indirect damages that have no other potential or contributory causes.

Furthermore, it is clear that Ameren's allegations that S&WC's breach of safety protocols and the seriousness of the event are based on its claims for breach of contract and property damage. Ameren expressly alleged that these damages were, "a result of these breaches of the Agreement, which resulted in [] property damage." Compl. ¶ 53. Indeed, the damages are

detailed in paragraph 53 of the complaint, under the heading "Count III: Stone & Webster Breach of Contract." Id. at ¶ 53. Likewise, under the negligence claim in Count IV, Ameren alleged that, "the seriousness of the event, including both property damage and personal injury" caused the damages. Id. at ¶ 59. No matter how Ameren attempts to label it now, and drawing all reasonable inferences on its behalf, it is clear that Ameren's claims for category (b) through (e) damages are based on breach of contract and property damage.

Moreover, as discussed above, consequential or indirect damages based on breach of contract and property damage are barred by the parties' Agreement. Such damages are barred "howsoever caused, including negligence." Ameren seeks the same consequential or indirect damages under its negligence claim as it does under its breach of contract claim. The only difference between the two claims is that one asserts that the acts were caused by negligence. Because the parties expressly agreed that such damages are barred "howsoever caused, including negligence," the inclusion of a negligence theory does not remove the bar to recovery which I have already determined applies to these damages. As a result, Ameren's claim for negligence is barred to the extent that is seeks recovery for the following categories of damages: (b) $782,000 for delaying the state of "Refuel 19" for two days; (c) $265,000 for S&WC employees that were sent offsite to be remediated and given a safety orientation after the arc flash incident; (d) $38,000 for safety stand downs conducted by Ameren for all employees at Callaway after the arc flash incident; and (e) $40,000 for Ameren to train and badge new employees after the arc flash incident.

Accordingly,

**IT IS HEREBY ORDERED** that defendant CB&I Stone & Webster Construction, Inc.'s Motion for Partial Judgment on the Pleadings #[26] is **GRANTED**.

**IT IS FURTHER ORDERED** that defendant CB&I Stone & Webster Construction, Inc.'s Motion for Partial Summary Judgment #[57] is **DENIED** without prejudice as moot.

_____
RODNEY W. SIPPEL
UNITED STATES DISTRICT JUDGE

Dated this 19th day of March, 2015.